UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FELICIA RACINE, | **COMPLAINT** |
| Plaintiff, | Jury Trial Demanded |
| -against- | Index No.: |
| KOCH INDUSTRIES, INC., JULIA KOCH, an individual, MARY KOCH, an individual, and MATADOR SECURITY COMPANY NY, LLC, | |
| Defendants. | |

Plaintiff Felicia Racine ("Plaintiff"), by and through her attorneys, The Law Office of David H. Rosenberg, P.C., complaining of Defendants Koch Industries, Inc. ("Koch Industries"), Julia Koch ("Julia", female), Mary Koch ("Mary", female), and Matador Security Company NY, LLC ("Matador" and all together as "Defendants") herein, alleges upon knowledge as to herself and her own actions, and upon information and belief as to all other matters, as follows:

## JURISDICTION AND VENUE

1. This is a wage/hour violation, gender, familial/marital status discrimination, and retaliation case brought pursuant to Title VII of the Civil Rights Act of 1964, the New York City Human Rights Law, New York City Administrative Code § 8-502(a), *et seq.* ("NYCHRL"), the New York State Human Rights Law, Executive Law § 296, *et seq.* ("NYSHRL"); the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 ("FLSA"); New York Labor Law §§ 650 *et seq.* and 190 *et seq.* ("NYLL"); the New York "spread of hours" pay required under 12 N.Y.C.R.R. § 142, and any other cause of action which can be inferred from the facts set forth herein.

2.  The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 28 U.S.C. § 1343(a)(4).

3.  Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this cause of action, including the unlawful employment practices alleged herein, occurred in this district.

4.  All conditions precedent to maintaining this action have been met. A charge of discrimination was duly filed with the Equal Employment Opportunity Commission and a Notice of Right to Sue was mailed to Plaintiff on September 29, 2020. Plaintiff received the Notice of Right to Sue on September 30, 2020 and this action has been filed within ninety (90) days of receipt.

**PARTIES**

5.  At all relevant times, Plaintiff, a female veteran of the United States Air Force, was an employee of Defendant.

6.  At all relevant times, Rudolph Racine, a male, was Plaintiff's husband and, since May of 2012, an active member of the U.S. Army.

7.  At all relevant times, Matador was and still is a private security company located at 111 Eighth Avenue, New York, New York, 10011.

8.  At all relevant times, Julia, Mary, John Koch ("John"), and David Koch Jr. ("David Jr."), are members of David Koch Sr.'s ("David Sr.") family known as the Koch family, an American family known for their political activities and control of Koch Industries ("Koch family"), generally known as the second largest privately-owned company in the United States. Julia was David Sr.'s wife. Their sons together are David Jr. and John. Their daughter is Mary.

9.  At all relevant times, Plaintiff was assigned to provide private security to several members of the Koch family including Julia, Mary, John and David Jr.

10. At all relevant times, Mary and Julia, individually and on behalf of Koch Industries, were Plaintiff's employers.

11. At all relevant times, Mary and Julia, individually and on behalf of Koch Industries, regularly directed Plaintiff's job duties, tasks, assignments, and hours.

12. At all relevant times, Matador was also Plaintiff's employer.

13. At all relevant times, Plaintiff was instructed by Matador to work for Mary, Julia, and Koch Industries as an employee; and to regularly accept daily job duties, tasks, assignments, and hours of service instructions from the same.

## BACKGROUND

14. On January 1, 2018, Plaintiff was hired by AS Solution to work for Matador as an executive protection specialist ("EPS") to perform private security services for several members of the Koch family and Koch Industries. At the time of hiring, Plaintiff told Louie Pellechio ("Pellechio", male, team leader/supervisor), who later became Plaintiff's supervisor, that she, Plaintiff, was a veteran of the U.S. Air Force. Plaintiff was paid approximately $575.00 per diem. Plaintiff does not have a "security degree" nor were any "specialized degrees" required in connection with the position.

15. Between January and July 2018, Plaintiff was wrongfully misclassified as an independent contractor; typically worked and was required to be on call 24 hours a day, 7 days per week, and on a rotation of 3 weeks on and 2 weeks off. However, during the 2 weeks off, Plaintiff was required to be on call and available to work at any moment's notice. Plaintiff was paid on a 1099 and taxes were not deducted from her pay.

16. Julia and Mary typically instructed Plaintiff to perform job tasks and duties; and had control over how many hours Plaintiff worked and the locations that Plaintiff was required to work at. Matador instructed Plaintiff to follow Julia and Mary's daily instructions.

17. On August 20, 2018, Matador and Koch Industries offered Plaintiff the EPS position with a flat salary of $155,000.00 per year. Plaintiff accepted the offer. Plaintiff was paid on a W2 and taxes were deducted from her pay. However, despite working in excess of 40 hours per week, Plaintiff was not paid at any rate for these hours much less the legally mandated rate of time and a half.

18. From August 2018 through March, 2020, Plaintiff typically worked seven days per week; 15 hours per day; was required to be on call 24 hours per day; worked a rotation of three weeks on and two weeks off; was required to be on call 24 hours per day even during those two weeks off; and yet was not paid at any rate for all hours worked in excess of 40 per week much less at the legally mandated rate of time and a half. Plaintiff was not paid the legally mandated spread of pay hours and her pay stubs did not accurately reflect all hours actually worked.

**FACTS**

19. Between January 2018 and August 2019, Plaintiff was generally assigned to the private security of Mary, Julia, and John who were all living in Manhattan at that time. Matador instructed Plaintiff to accept daily job tasks, assignments, duties, and time schedules from Mary, Julia, and from anyone else that Koch Industries instructed.

20. In January 2018, after being hired, Plaintiff was forced to undergo training. During training, Delana Long ("Long", female, EPS) told Plaintiff that, despite being married to David Sr., Julia had a boyfriend named Charles Manger ("Manger", male). Long told Plaintiff

generally, "I have taken her [Julia] to restaurants to meet Charles [Manger] but we are not to discuss any of the relationship." Throughout Plaintiff's employment, Manger typically visited with Julia at several Koch residences, while David Sr. was still alive, including the South Hampton residence. In essence, Plaintiff provided some security services for both Julia and Manger together as a couple.

21. On March 30, 2018, Pellechio told Plaintiff generally, "You are to bring a package from New York to David [Koch Jr.] at the West Palm Beach residence, do not open it, you are better off not knowing what it is." Plaintiff objected and told Pellechio, "No, I want to know what it is." Pellechio said, "No, I want you to have plausible deniability if caught." Plaintiff understood this to mean that she would be fired if she did not comply with the request. Plaintiff delivered the package as instructed. Later, Pellechio admitted, "It was David's [Koch Jr.] fake ID." Plaintiff objected and said generally, "I would have never delivered that, I could have gone to jail if I was caught flying with that." Pellechio replied generally, "I know, trust me, I was not happy about it, I told Julia that this was super illegal and could get us in a lot of trouble. She [Julia] said she didn't care and to do it anyway." This caused Plaintiff to fear the Koch family, Koch Industries, and Matador.

22. On June 1, 2018, Julia texted Plaintiff generally that Mary's underage boyfriend, Max, was not to spend the night in Mary's hotel room at the Charles Hotel. Thus, Plaintiff believed that Julia had delegated motherly duties to her, Plaintiff. Max spent the night with Mary in Mary's bed at the hotel and Plaintiff was forced to stay in the same suite. Other non-female EPS employees were not treated this way.

23. In or around June 2018, Julia planned a trip to South Africa for the entire Koch family which included her siblings, nieces, and nephews. Julia told Plaintiff generally, "Refer to this trip as Project X, I do not want him [David Sr.] going on the trip."

24. In or around August 2018, Plaintiff told Pellechio generally, "I am not sure if I want to be hired full time because I am worried that it will affect my job status down the road when my husband gets orders to PCS."[1] Pellechio assured Plaintiff that having a husband who was active in the U.S. Army would not preclude Plaintiff from employment and said generally, "Don't worry about that, it will not be a problem. Both Long and Doug Shultz[2] are flown in for their three-week rotations." Neither Long nor Shultz had spouses who were ever in the military. Plaintiff accepted the offer.

25. That same month, Plaintiff observed Mary say to Julia, "Mom, you are not coming?" Julia said, "No, I'm laying down, Felicia [Plaintiff] will go with you." Plaintiff was instructed by Julia to accompany Mary to Valentino, a design shop in Manhattan, for Mary's private fitting. At the design shop, in front of the female designer and Plaintiff, Mary completely disrobed revealing her nude body to Plaintiff. Plaintiff was embarrassed and shocked. Julia instructed Plaintiff to take pictures of Mary in dresses. Other non-female EPS employees were not treated this way.

26. That same month, Plaintiff was instructed by the Koch family to go on a yacht trip in Italy. Pellechio gave Plaintiff the week leading up to the trip off and said generally, "[Julia] wants you to go buy a wardrobe so you can blend in with the locals." The day before the trip, Pellechio told Plaintiff generally, "[Julia] no longer wants you on the trip. I told her you

---

[1] A "PCS" refers to a permanent change of station which incorporates an assignment, detail, or transfer to a different duty station under competent orders.
[2] At all relevant times, Doug Shultz ("Shultz") was a male EPS.

are coming to do your job as security not to be John's child care and she [Julia] said that if she [Plaintiff] doesn't want to be my [Julia's] child care for John then she [Plaintiff] is not coming on the trip. I said Felicia's [Plaintiff] job is security not childcare; you have nannies to do that." Other non-female EPS Employees were not treated this way. Plaintiff learned that, during a previous trip that summer, Long accompanied the Koch family and provided childcare instead of security.

27. In or around September 2018, Julia told several acquaintances including Talbott Maxey, and David Owens (from Palm Beach, Florida, who is commonly referred to as "Coach") in ear shot of Plaintiff, generally, "It took a lot of donations, a lot of money, a lot of cash to get David [Jr.] into Duke University, his high school grades were terrible." During these conversations, Julia would typically boast, "We gave a large, large, large cash contribution to the baseball program for their brand-new scoreboard" and say things like, "I wanted to offer the team a chartered plane to take them to and from games during the season." Julia told Pellechio, in earshot of Plaintiff, generally, "These Duke University financial contributions should go through Koch legal and be listed as anonymous, to cover it up." Pellechio later confided to Plaintiff words to the effect of, "I guess that's what a million-dollar education looks like" in regard to David Jr.'s attendance at Duke. This caused Plaintiff to further fear the Koch family, Koch Industries, and Matador.

28. Later that same month, Pellechio confided in Plaintiff, that he was uncomfortable with some of the business dealings the family had been doing. Pellechio told Plaintiff, "I just want to give you a heads up that I am looking for other employment opportunities as I am becoming increasingly more uncomfortable with some of the immoral and illegal things the family is a part of, as well as things they have asked me to do." Plaintiff asked Pellechio,

"Do you think if we were to get in any sort of legal trouble while doing tasks the family has requested that Koch Industries would provide us with legal counsel?" Pellechio replied, "Honestly, I don't know, and I would recommend that you do not count on it." Plaintiff then told Pellechio about conversations Plaintiff overheard from Julia regarding the donation to Duke University and asked, "Is that how David [Jr.] was able to get admitted into such a difficult school?" Pellechio replied generally:

> Remember a couple of weeks ago when she [Julia] was discussing with me that she wanted to make sure legal had made the donation anonymous to Duke? I am sure the $1,000,000.00 she [Julia] gave the Duke team for a new score board helped secure his [David Jr.] made-up position as team manager and get him [David Jr.] into Duke as a student.

Pellechio resigned approximately two months later. This caused Plaintiff to further fear the Koch family, Koch Industries, and Matador.

29. In or around October 2018, Julia purchased a 40 million-dollar townhouse in New York. Julia instructed Plaintiff generally, "Refer to the house as Hamilton, do not talk about this in front of David Sr., the kids want to move out of the apartment with him because they can't deal with him anymore." A few weeks later, the *New York Post* published an article about Julia's purchase and Julia instructed Plaintiff generally, "Get rid of any newspapers articles about this so that he [David Sr.] won't see." This caused Plaintiff to further fear the Koch family, Koch Industries, and Matador.

30. In or around October 2018, Shultz told Plaintiff words to the effect of, "I am forced to buy alcohol for David Jr. who is underage, and it is not right." Plaintiff relayed this comment to Pellechio and said generally, "I also do not feel comfortable buying alcohol for Mary if she asks because she [Mary] is underage." Pellechio said words to the effect of, "I agree, I

have expressed my concerns to Randy[3] and he said your job is to serve the clients, that is what you are paid to do, or they will find someone that will. What this comes down to is the fact that you are replaceable, they have so much money, they can easily find someone to do what they want." This caused Plaintiff to further fear the Koch family, Koch Industries, and Matador.

31. In or around February 2019, William Berge ("Berge", male, Matador team leader) told Plaintiff generally, "[Julia] had a replica made of Amedeo Modigliani's multi-million-dollar original painting while [David Sr.] was in South Hampton [at the Koch's South Hampton residence] so that she [Julia] could swap it with the original in the apartment [shared with David Sr.] so that he [David Sr.] would not know it is missing." This caused Plaintiff to further fear the Koch family, Koch Industries, and Matador.

32. On March 10, 2019, Mary texted Plaintiff, "Where's the car [sic] Have an appointment to go to now." However, Plaintiff was not told in advance of any request for Plaintiff to drive Mary. Other non-female EPS employees were not treated this way.

33. On March 17, 2019, Julia texted Plaintiff the following picture and asked, "Can you buy her a woman.s [sic] sun shirt at the gift shop in a size medium that covers her top half [sic]"? Other non-female EPS employees were not treated this way.



---

[3] At all relevant times, Randy Landen ("Landen") was the male director of security for Matador.

34. On June 1, 2019, at 11:09 p.m., Julia texted Plaintiff, "Mary is depressed [sic] Have you spoken with her [sic]?" Thus, Plaintiff believed that Julia had delegated motherly duties to her, Plaintiff. Other non-female EPS employees were not treated this way.

35. On June 18, 2019, Julia texted Plaintiff, "Can you check on MJ [Mary] She [sic] is lonely [sic]". Again, Plaintiff believed that Julia had delegated motherly duties to her, Plaintiff. Other non-female EPS employees were not told to check on Mary because Mary was lonely.

36. In or around July 2019, several of David Sr.'s nurses would typically say to Plaintiff words to the effect of, "[Julia] won't allow him [David Sr.] to have a feeding tube, it's not right, he's gonna [sic] die, we are uncomfortable with it because he is no longer eating and is basically starving to death" and that Julia had told several of the nurses words to the effect of, "I do not want to continue to prolong his [David Sr.'s] situation." Thus, Plaintiff believed that Julia had refused David Sr.'s feeding tube because Julia could not deal with David Sr. anymore and did not want his life prolonged further. This caused Plaintiff to further fear the Koch family, Koch Industries, and Matador.

37. Around the same month, during a dinner party where Julia had several friends over, David Sr. came down from his bedroom, joined the group, lovingly placed his hand on Julia's arm and said, "I love her." Julia, with Plaintiff in tow as "security", told Palm Beach House Manager Rolando Aguielera, and several of David Sr.'s nurses, words to the effect of, "Escort him [David Sr.] back to this room now, you have to lock the door, lock him there so he doesn't interrupt the dinner party again." This caused Plaintiff to further fear the Koch family, Koch Industries, and Matador.

38. On August 23, 2019, David Sr. died.

Mary attends Harvard University

39. In or around September 2019 and through February 2020, Plaintiff was generally assigned to the private security of Mary in Boston, Massachusetts, where Mary was attending college at Harvard University as a freshman.[4] During this time, Mary instructed Plaintiff to perform menial non-EPS related tasks. For example, Mary typically instructed Plaintiff to do the following:

    a.  Order and purchase custom made smoothies for Mary;

    b.  separate the dry cleaning from the general laundry from Mary's laundry bags;

    c.  deliver Mary's dry cleaning to a dry cleaner;

    d.  retrieve the dry cleaning from the dry cleaner;

    e.  remove the plastic covering and hangers from the dry cleaning;

    f.  fold Mary's clothes and deliver them back to Mary;

    g.  purchase tampons for Mary;

    h.  shop and purchase tights, dresses, tops, shoes, and breakfast bars for Mary;

    i.  purchase, retrieve, and deliver books from Harvard's on-campus bookstore for Mary;

    j.  purchase, retrieve, and deliver water bottles, tissues, mints, and school supplies for Mary; and

    k.  print out Mary's work assignments and homework.

Other non-female EPS employees were not required to purchase/deliver Mary's tights, dresses, tops, shoes, and tampons.

40. In September 2019, on Plaintiff's first day of Harvard University "security detail", Plaintiff picked Mary up at the Charles Hotel. Plaintiff learned that Mary did not like the

---

[4] Mary was supposed to stay at the Cannaday dorm room and Matador provided a private apartment at the Avalon North Point in Cambridge, MA, for Felicia to stay at which was located approximately 15 minutes in distance without traffic from the Cannaday dorm room.

accommodations at the Cannaday dormitory which lead to Mary staying most of the time at the posh Charles Hotel.

41. On October 5, 2019, at approximately 11:00 p.m., Mary, who was at China King, called Plaintiff and said generally, "I need you to come inside, one of my friends is not responding." Plaintiff went inside of China King and observed fellow underage Harvard student Sara Mann ("Mann") black out drunk. At this point, Plaintiff was able to ascertain that all of Mary's underage Harvard University freshmen students had been drinking to the point of inebriation. Mary said, in front of her friends, generally, "It's ok, Felicia [Plaintiff] is an EMT, she'll take care of it." Plaintiff checked Mann's vitals and realized that an ambulance was needed. Approximately 45 minutes later, Mann was transferred to the hospital via ambulance and Plaintiff drove Mary and the rest of her inebriated underage freshman friends back to the dorms at Harvard. During the drive, which was at approximately 12:00 a.m. the following day, Plaintiff had to stop the car twice to let Mary's friends vomit outside of the car.

42. On October 6, 2019, Mary expressed disgust at Plaintiff's decision to call for an ambulance to transport Mann to the hospital and said, "Sara's [Mann] upset with me, she said this has happened before and she never needed an ambulance. Now her parents have to pay the ambulance bill." Thus, Plaintiff felt that Mary was trying to gaslight Plaintiff into believing that calling the ambulance was unnecessary. Other non-female EPS employees were not treated this way.

43. On October 11, 2019, while assigned to Mary's security detail in Austin, Texas, Mary was partying and drinking to the point of inebriation. Julia texted Plaintiff, "Is she [Mary] using a fake is [sic] ID [sic] I think it is a felony in [Austin] Texas"? Thus, Plaintiff again felt

that Julia had delegated motherly duties to her, Plaintiff. To this point, Julia told Plaintiff to drive Mary around for some "[n]ice shopping in Highland Park Village" and that Mary "needs to see the nice side of Dallas and nap tomorrow on the plane." Other non-female EPS employees were not treated this way.

44.  On October 21, 2019, Landen, at a memorial service for David Sr., asked Plaintiff, "How are things going in Boston with Mary [Koch]?" Plaintiff replied generally, "Mary has asked me to do a lot of things she doesn't ask male employees to do like buy her clothes, shoes, and stuff that is not the job a security officer. She also drinks a lot of alcohol with her other underage friends at Harvard and I get really nervous about all of it." Landen said, "You shouldn't care, you are being paid, as long as the checks are coming every two weeks you should be happy" and walked away. Later, Felica told Berge, "Mary has asked me to do a lot of things she doesn't ask male employees to do like buy her clothes, shoes, and stuff that is not the job a security officer. I told Randy [Landen] this and he [Landen] said I shouldn't care and walked away." Notwithstanding Plaintiff's complaint of gender discrimination, no investigation was conducted, no corrective action was taken, and no disciplinary action was given. To the contrary, Plaintiff was forced to continue working in the aforesaid hostile work environment.

45.  On November 6, 2019, Joe Gomes ("Gomes", male, EPS) told Plaintiff, "Julia was talking to Mary about having you make the bed for Mary, sorry, thought you should know." Other non-female EPS employees, such as Gomes and Shultz, were not treated this way.

46.  That day, Plaintiff complained to Berge generally, "Joe Gomes told me that Julia wanted me to make Mary's bed for her." Berge replied, "Yes, Julia did say that to Mary." Plaintiff said, "That is not my job, you know that, why did you not stand up for me?" Berge stated,

"She [Julia] said that you are more of an assistant while the guys are actually security so she would never ask the guys to do that." Plaintiff said words to the effect of, "I have exactly the same qualifications as the men on the team, just because I am a female should not have anything to do with the tasks that I am asked to do." Berge, who seemed to support and condone the discriminatory treatment, tried to gaslight Plaintiff and said generally, "Why are you getting so angry, it is not that big of a deal."

47. On or around November 15, 2019, Mary instructed Koch Industries to provide her, Mary, with a party bus (high occupancy vehicle) to transport her [Mary] and her friends from Harvard to New Haven Connecticut for the Harvard v. Yale college football game which was to take place the weekend of November 23, 2019.

48. On November 17, 2019, a Sunday during which Mary had no classes to attend, Mary texted Plaintiff and requested that Plaintiff get a smoothie for her, Mary, at or around 11:00 a.m. Plaintiff did as instructed, purchased a custom smoothie for Mary, picked Mary up at 11:00 a.m., and transported Mary to campus where Mary had Plaintiff wait in Mary's car until approximately 1:00 a.m. the following day when Mary finally returned to the car for transport back to the Charles Hotel.

49. On November 18, 2019, Mary had Plaintiff waiting in the car from approximately 10 a.m. to approximately 2:14 a.m. while Mary was out partying and drinking again.

50. On November 22, 2019, Mary texted Plaintiff, "Do you know what time the bus arrives tomorrow? Also [sic] We want to drink on the bus so do you think we should be discreet? None of us are 21 but we can show a fake ID if need to prove our age in order to drink [sic]". This made Plaintiff feel very uncomfortable and emotionally distressed. Other non-female EPS employees were not treated this way.

14

51. On November 23, 2019, Berge instructed Plaintiff, "Please follow the party bus in another vehicle, Mary doesn't want you on the bus. The driver knows they are all underage and they are not allowed to have any alcohol." Plaintiff did as instructed and followed the party bus. All of the Harvard students, including Mary, were under the drinking age of 21, and drank excessive amounts of alcohol while on the party bus. Mary instructed Plaintiff to purchase Veuve Clicout champagne and White Claws for her, Mary. This made Plaintiff feel uncomfortable and emotionally distressed. Other non-female EPS employees were not treated this way.

52. On November 24, 2019, Mary told Plaintiff that she, Mary, was going to fly back to Harvard on Mary's friend's private plane. Plaintiff informed Julia of this and Julia responded, "I don't want Mary flying on her friend's plane, she needs to either take a train or drive back with you." Notably, Julia did not communicate this instruction directly to Mary; rather, Julia communicated it through Plaintiff. Thus, Plaintiff felt that Julia was again trying to delegate motherly duties to her, Plaintiff. Other non-female EPS employees were not treated this way.

53. On December 15, 2019, Mary went out partying and drinking again with her underage Harvard student friends. At or around 2:45 a.m., Mary finally went home. At 3:02 a.m., Plaintiff texted Julia as instructed, "Mary is home and in for the night."

54. On December 20, 2019, at 1:28 a.m., Julia instructed Plaintiff to tell Mary, who was out partying and drinking late at night again, that she (Mary) needed to come home. Notably, Julia did not communicate this directly to Mary. Thus, Plaintiff felt that Julia was again trying to delegate motherly duties to her, Plaintiff. Plaintiff did as instructed and told Mary that she needed to come home. However, Mary refused the request and continued to party

and drink late into the evening. Mary told Plaintiff to tell Julia that Mary's location was "ambiguous." Plaintiff told Mary, "I can't tell her that Mary, she would freak if she thought I did not know exactly where you were." Finally, at approximately 2:45 a.m., Mary, who had Plaintiff waiting in Mary's car the entire night from the day before (and into the early hours of December 20, 2019) texted Plaintiff, "Leaving in an Uber." Mary was not ready to be driven home by Plaintiff until approximately 5:15 a.m. Other non-female EPS employees were not treated this way.

55. On December 22, 2019, at 12:22 a.m., Julia asked Plaintiff generally if she could help find David Jr.'s "7/8 black cashmere coat in a sea of coats" because David Jr. "lost his coat check number". Other non-female EPS employees were not treated this way.

56. On January 4, 2020 at 12:41 a.m., Julia texted Plaintiff, "MJ [Mary] is mentioning going to Camelot [a night club]. I said no [sic] Has she contacted you [sic]"? Thus, Plaintiff felt that Julia was again trying to delegate motherly duties to her, Plaintiff. Other non-female EPS employees were not treated this way.

57. On January 24, 2020, Mary had Plaintiff waiting from approximately 10:00 a.m. until 4:16 a.m. the next day, in the car, while Mary was out partying and drinking again.

58. On January 25, 2020, at 12:49 a.m. Plaintiff texted Mary, "Are you guys coming back out??[sic]" Finally at 4:16 a.m., Mary texted, "So sorry I'm just seeing this [sic] Hope the driver went home".

59. On February 3, 2020, at 1:07 a.m., after Mary was partying and drinking into the late hours of February 2, 2020, Mary texted Plaintiff, "Could you make sure to pack up the two bottles of alcohol in the bar as well?" That morning, at 9:37 a.m., Mary texted Plaintiff, "Can you make me a coffee no foam"? Other non-female EPS employees were not treated this way.

60. On February 5, 2020, Brad Commisar ("Commisar", male), Julia's best friend and real estate agent, texted Plaintiff an apartment layout drawing for Mary's apartment. Julia directed Commisar to text Plaintiff, "Please be the adult in the room and go with her per Mrs[5] [sic] If so, can you take a tape measure and confirm some of the dimensions of the main rooms ( ie [sic] from which wall are Some [sic] Of [sic] the dimensions noted [sic]". Other non-female EPS employees were not treated this way.

61. On February 7, 2020, at 6:34 p.m., Mary instructed Plaintiff to purchase 3 bottles of chardonnay wine for her, Mary.

62. Plaintiff complained to Berge generally, "Mrs. [Julia] has been trying to mother Mary through me and treats me differently than the male security guards. Today, she had Brad Commisar text me an apartment drawing and said that I need to be the adult, take measurements, and you know that's not my job as a security guard." Berge laughed out loud uncontrollably for approximately eleven seconds. Plaintiff was then retaliated against for complaining about the gender discrimination.

63. On March 10, 2020, Laden, on a conference call with Plaintiff and Katie Gumfory ("Gumfory", female, human resource director for Koch Industries), asked Plaintiff generally, "What is going to happen with you when your husband moves to California to report for air force duty this summer?" Plaintiff replied generally, "It will not affect my armed guard license for New York as I am still military and therefore can remain a New York State resident even if I am in California for part of the time." Landen said, "Your position is local, you are required to live in the city in case you are needed on your off time." Plaintiff said, "When Louie [Pellechio] hired me in the summer of 2018, he said

---

[5] Julia was commonly referred to as simply "Mrs."

living somewhere outside of the city during off time will not be an issue." Landen replied,

"He [Pellechio] is no longer with us and your position requires you to be local." Other non-

female EPS employees, those who did not have spouses active in the military, and those

who did not oppose discriminatory practices, were not treated this way.

64. On April 1, 2020, Plaintiff was terminated.

65. As a result of the discriminatory/retaliatory termination, Plaintiff suffers and continues to

suffer from emotional and economic damages.

### CONCLUSION

Defendants subjected Plaintiff to adverse employment actions, chiefly being the

termination, as well as an atmosphere of adverse employment actions on account of gender,

familial/marital status, and in retaliation because of Plaintiff's participation in the protected

activity of opposing discriminatory practices in violation of Title VII, the NYCHRL, the

NYSHRL, together with any other cause of action which can be inferred. As a result, Plaintiff

suffered, and continues to suffer, damages.

Defendants also committed the aforesaid wage and hour violations in violation of the

FLSA, NYLL, and aforesaid mandatory spread of hours requirement. As a result, Plaintiff

suffered, and continues to suffer, damages.

WHEREFORE, Plaintiff demands judgment against Defendants for all compensatory,

emotional, physical, and punitive damages (where applicable), lost pay, front pay, injunctive relief,

reinstatement and any other damages permitted by law. It is further requested that this Court grant

reasonable attorneys' fees and the costs and disbursements of this action and any other relief to

which Plaintiff is entitled. Plaintiff demands a trial by jury.

Dated: Mineola, New York
      November 11, 2020

THE LAW OFFICE OF DAVID H. ROSENBERG, P.C.

DAVID H. ROSENBERG
The Law Office of David H. Rosenberg, P.C.
*Attorneys for Plaintiff*
170 Old Country Road, Suite 600
Mineola, N.Y. 11501
Ph: (516) 741-0300
F: (516) 385-4848